# Exhibit A

WIPO
WORLD INTELLECTUAL PROPERTY ORGANIZATION

ARBITRATION AND MEDIATION CENTER

# ADMINISTRATIVE PANEL DECISION

Nexus Mutual Limited v. Mira Holdings
Case No. D2026-1863

## 1. The Parties

The Complainant is Nexus Mutual Limited, United Kingdom, internally represented.

The Respondent is Mira Holdings, United States of America ("United States"), internally represented.

## 2. The Domain Name and Registrar

The disputed domain name <nexusmutual.com> is registered with DropCatch.com 601 LLC (the "Registrar").

## 3. Procedural History

The Complaint was filed with the WIPO Arbitration and Mediation Center (the "Center") on April 30, 2026. On April 30, 2026, the Center transmitted by email to the Registrar a request for registrar verification in connection with the disputed domain name. On May 4, 2026, the Registrar transmitted by email to the Center its verification response disclosing registrant and contact information for the disputed domain name which differed from the named Respondent (Redacted for privacy) and contact information in the Complaint. The Center sent an email communication to the Complainant on May 5, 2026, providing the registrant and contact information disclosed by the Registrar, and inviting the Complainant to submit an amendment to the Complaint. The Complainant filed an amendment to the Complaint on May 6, 2026.

The Center verified that the Complaint together with the amendment to the Complaint satisfied the formal requirements of the Uniform Domain Name Dispute Resolution Policy (the "Policy" or "UDRP"), the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules"), and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the "Supplemental Rules").

In accordance with the Rules, paragraphs 2 and 4, the Center formally notified the Respondent of the Complaint, and the proceedings commenced on May 7, 2026. In accordance with the Rules, paragraph 5, the due date for the Response was May 27, 2026. The Respondent requested the automatic four-day extension on May 11, 2026, which the Center granted on May 12, 2026, extending the due date for the Response until May 31, 2026. The Response was filed with the Center on May 31, 2026 (in the Respondent's time zone). The Complainant filed a Supplemental Filing on June 15, 2026.

The Center appointed Jeremy Speres, Christopher S. Gibson, and Gerald M. Levine as panelists in this matter on June 25, 2026. The Panel finds that it was properly constituted. Each member of the Panel has submitted the Statement of Acceptance and Declaration of Impartiality and Independence, as required by the Center to ensure compliance with the Rules, paragraph 7.

On July 1, 2026, the Parties jointly requested a 10-day suspension of these proceedings to explore settlement. The Panel issued Procedural Order No. 1 on July 2, 2026, suspending the proceedings until July 12, 2026. On July 7, 2026, the Parties jointly requested a 7-day suspension of the proceedings. The Panel issued Procedural Order No. 2 on July 16, 2026, suspending the proceedings until July 22, 2026. On July 28, 2026, the Respondent filed a Supplemental Filing. The Panel issued Procedural Order No. 3 on August 3, 2026, admitting the Complainant's and the Respondent's Supplemental Filings and inviting the Complainant to comment on a new claim raised in the Respondent's Supplemental Filing by August 8, 2026. The Complainant responded on August 8, 2026. The Respondent submitted an unsolicited Supplemental Filing on August 10, 2026. The Complainant submitted an unsolicited Supplemental Filing on August 12, 2026.

**4. Factual Background**

The Complainant is a blockchain-based discretionary mutual insurance company founded in 2018, operating in the field of cryptocurrency asset protection and smart contract cover under the NEXUS MUTUAL mark.

The Complainant owns United Kingdom Trademark Registration No. UK00004124145 NEXUS MUTUAL in class 42, having a registration date of May 9, 2025.

The Respondent is a domain name investor with thousands of domain names under ownership. The Respondent has been cited as the respondent in numerous cases decided under the Policy. Some of those cases have been decided in its favour, whilst others have been decided against it.

The disputed domain name was registered on November 28, 2023, and acquired by the Respondent through an expired domain name auction on December 2, 2023, with the winning bid having been USD 53,499. The Respondent subsequently listed the disputed domain name for sale for USD 250,000.

**5. Parties' Contentions**

**A. Complainant**

The Complainant contends that it has satisfied each of the elements required under the Policy for a transfer of the disputed domain name.

Notably, the Complainant contends that the Respondent was aware of the Complainant's reputation in its NEXUS MUTUAL mark built up since 2018 when it acquired the disputed domain name, and that the Respondent's immediate listing of the disputed domain name for sale for USD 250,000 evidences the Respondent's intent of selling the disputed domain name to the Complainant for an amount far in excess of its out-of-pocket costs relating directly to the disputed domain name.

**B. Respondent**

The Respondent contends that the Complainant has not satisfied the elements required under the Policy for a transfer of the disputed domain name.

Notably, the Respondent contends as follows. "Nexus Mutual" is a common combination of ordinary words which is used by numerous companies around the world. The Respondent has legitimate interests as a domain name investor in holding a domain name that is a common phrase in ordinary English conversation which is demonstrably used by various companies.

The Respondent owns many dictionary word domain names, including ones featuring "nexus". The Respondent refers to its ownership of <nexusworks.com>, <nexushotel.com>, and <housenexus.com> in this regard, and argues that its registration of the disputed domain name was undertaken in this vein, without awareness of or intent to target the Complainant.

It argues that merely listing a dictionary word domain name for sale, including at a high asking price, is not itself evidence of bad faith intent absent proof the domain was registered primarily to sell it to the Complainant.

The Respondent argues that the Complainant's conduct in bidding at the expired domain name auction for the disputed domain name, later offering the Respondent USD 25,000 for the disputed domain name and then filing the Complaint after the Parties failed to agree on a price, reveals the Complaint as being opportunistic and in bad faith. The Respondent asks for a finding of Reverse Domain Name Hijacking ("RDNH").

## 6. Discussion and Findings – Panel Majority

### A. Procedural Issue – Supplemental Filings

Both Parties filed unsolicited supplemental filings.

Paragraphs 10 and 12 of the Rules in effect grant the Panel sole discretion to determine the admissibility of unsolicited supplemental filings. Admissibility of supplemental filings is to be assessed based on relevance, foreseeability, the need to conduct the proceedings with due expedition, and the equal treatment of the parties so that each has a fair opportunity to present its case. Paragraph 10(b) of the Rules; *Societé aux Loteries en Europe, SLE v. Take That Ltd.*, WIPO Case No. D2007-0214; WIPO Overview of WIPO Panel Views on Select UDRP Questions ("WIPO Overview 3.1"), section 4.6.

The Panel admitted the Complainant's Supplemental Filing of June 15, 2026, and the Respondent's Supplemental Filing of July 28, 2026, in Procedural Order No. 3. This was on the basis that the Response contained an allegation of RDNH that the Complainant should be allowed to defend itself against, and on the basis that the Complainant's Supplemental Filing of June 15, 2026, raised a new issue that the Respondent should be permitted to respond to.

In Procedural Order No. 3, the Panel invited the Complainant to comment on a new issue raised in the Respondent's Supplemental Filing of July 28, 2026, specifically the allegation that the Complainant or its associate had participated in the earlier auction for the disputed domain name. Given that the Respondent had already addressed this allegation in its earlier Supplemental Filing, the Panel did not invite the Respondent to respond to that point any further.

The Complainant's response to Procedural Order No. 3 went beyond the narrow issue that it was invited to address. To that extent, the Complainant's Supplemental Filings of August 8 and August 12, 2026, are not admitted. The Respondent's Supplemental Filing of August 10 is also not admitted given that the Panel did not invite the Respondent to comment any further in Procedural Order No. 3. Additionally, after Procedural Order No. 3, and apart from the Complainant's response to the narrow auction bidder issue that was solicited by the Panel, the Parties' supplemental filings addressed matters that had already largely been canvassed in their earlier filings, and those supplemental filings stand to be excluded from the record on that basis, too.

**B. Identical or Confusingly Similar**

It is well accepted that the first element functions primarily as a standing requirement. The standing (or threshold) test for confusing similarity involves a reasoned but relatively straightforward comparison between the Complainant's trademark and the disputed domain name. WIPO Overview 3.1, section 1.7.

The Complainant has shown rights in respect of a trademark or service mark for the purposes of the Policy. WIPO Overview 3.1, section 1.2.1.

The entirety of the mark is reproduced within the disputed domain name. Accordingly, the disputed domain name is identical to the mark for the purposes of the Policy. WIPO Overview 3.1, section 1.7.

The Panel finds the first element of the Policy has been established.

**C. Rights or Legitimate Interests**

Paragraph 4(c) of the Policy provides a list of circumstances in which the Respondent may demonstrate rights or legitimate interests in a disputed domain name.

Although the overall burden of proof in UDRP proceedings is on the complainant, panels have recognized that proving that a respondent lacks rights or legitimate interests in a domain name may result in the difficult task of "proving a negative", requiring information that is often primarily within the knowledge or control of the respondent. As such, where a complainant makes out a prima facie case that the respondent lacks rights or legitimate interests, the burden of production on this element shifts to the respondent to come forward with relevant evidence demonstrating rights or legitimate interests in the domain name (although the burden of proof always remains on the complainant). If the respondent fails to come forward with such relevant evidence, the complainant is deemed to have satisfied the second element. WIPO Overview 3.1, section 2.1.

Having reviewed the available record, the Panel finds the Complainant has established a prima facie case that the Respondent lacks rights or legitimate interests in the disputed domain name. The Respondent's case on the second element is, in essence, that it has used the disputed domain name in connection with a bona fide offering of goods or services as a professional domain name investor who trades in dictionary-word domain names based on their semantic value rather than any trademark significance they may have.

Trading in domain names for their semantic value, without any intent to target a trademark, may amount to a bona fide offering of goods or services under paragraph 4(c)(i) of the Policy. WIPO Overview 3.1, section 2.10. However, for the reasons addressed in relation to bad faith below, the Panel finds that the Respondent was or should have been aware of the likelihood of confusion with the Complainant's mark, and that its offering of the disputed domain name for sale was not bona fide.

The Panel finds the second element of the Policy has been established.

**D. Registered and Used in Bad Faith**

The Panel notes that, for the purposes of paragraph 4(a)(iii) of the Policy, paragraph 4(b) of the Policy establishes circumstances, in particular, but without limitation, that, if found by the Panel to be present, shall be evidence of the registration and use of a domain name in bad faith.

The Panel finds that it is likely, on the balance of probabilities, that the Respondent's intention was to sell the disputed domain name to the Complainant for valuable consideration in excess of its out-of-pocket costs, falling within paragraph 4(b)(i) of the Policy, alternatively that the Respondent failed in its duty to conduct due diligence searches prior to acquiring the disputed domain name.

Although the Complainant's trademark only proceeded to registration after the disputed domain name was acquired by the Respondent, the Panel accepts that the Complainant's evidence establishes that its NEXUS MUTUAL mark enjoyed a reputation and common law rights prior to acquisition of the disputed domain name. The Complainant's evidence in this regard included favourable media coverage predating the disputed domain name's acquisition, including highly positive articles on the prominent cryptocurrency news platform CoinDesk in 2020 and 2021.

The Complainant presented the results of a Google search for "Nexus Mutual", time-bound to results published between December 1, 2022, and December 1, 2023, geographically targeted to the Respondent's jurisdiction of the United States. The results overwhelmingly and almost exclusively relate to the Complainant's offering across the first three pages of results.

The Panel notes that the panel in *South African Bankers Services Company Proprietary Limited v. Zouhair Bairouk, ZouhaieInvest*, WIPO Case No. D2025-5203 recently commended the probative value of such historical and geographically targeted Internet searches, stating:

"As a general matter, the Panel notes that the specific geographically-targeted, and time-bound search queries and results provided as annexes to the complaint, as well as the specific AI prompts and replies, represent the precise types of evidence that would be expected of a complainant seeking to address potential respondent claims of unawareness and/or descriptive connotations of a mark. On the other hand, a party's failure to provide specific evidence of such searches/results may undermine the assertion being made."

The Panel was not presented with any explanation of what a historical Google search such as that embodied in the Complainant's evidence actually represents. Nevertheless, the Panel has independentlyestablished, using publicly available explanations, including from Google itself, that such a historical Google search does not necessarily exactly reproduce the results page that a user would actually have seen had they run the same search in late 2023 (when the Respondent acquired the disputed domain name). [1] Rather, such searches filter Google's current index using what Google calls a "byline date", which is Google's own estimate of when a given page was published or last updated. Reference is had to the following Google support websites: "developers.google.com/search/docs/appearance/publication-dates" and "developers.google.com/search/blog/2019/03/help-google-search-know-best-date-for".

The Panel has been unable to find any publicly available source from Google itself explaining how the historical results are ranked. However, the Panel did find one comprehensive blogpost published by a credible source, namely Nicholas Taylor – the Deputy Group Leader for Technology Strategy and Services at the Los Alamos National Laboratory Research Library, who has previously managed digital library and digital preservation at, amongst others, the United States Library of Congress and Supreme Court. The blogpost explains: "Whether or not Google maintains historical search indexes, it does not consult them for the purpose of relevance evaluation for queries using the date operators; relevance evaluation takes place against the contemporary index."[2]

This suggests that Google's historical search tool ranks the results using its present-day index, not a historical one. The Complainant's historical Google search therefore cannot be treated as an authoritative, exact historical record of search rankings as they stood at the time of acquisition of the disputed domain name. Nevertheless, the Panel finds that many of the results that the historical search revealed are from prominent sources that would likely have ranked highly, and the historical search does have probative value as showing that a substantial volume of content concerning the Complainant's business was published and likely indexed by Google in the period immediately preceding the Respondent's acquisition of the disputed

---

[1] In accordance with its powers articulated inter alia in paragraphs 10 and 12 of the Rules, the Panel is entitled to conduct limited independent research into matters of public record. WIPO Overview 3.1, section 4.8.

[2] The blogpost is available at the following website: "nullhandle.org/blog/2022-11-29-subtleties-of-the-google-date-search-operators.html".

domain name. The almost complete absence from the historical results presented by the Complainant of anything unrelated to the Complainant suggests that the Complainant's offering would indeed have dominated the search results of a contemporaneous search conducted when the disputed domain name was acquired, as set out in the Complainant's historical Google search evidence.

On balance of probabilities, and in the absence of any countervailing evidence from the Respondent showing otherwise, the Panel considers that the Complainant's historical Google search evidence is likely broadly representative of what the Respondent would have seen had it conducted a Google search at the time of acquiring the disputed domain name. This is bolstered by the fact that the Complainant has also presented the results of a relatively current Google search, which exclusively relate to the Complainant across the first three pages.

The Respondent is coy on what it knew, and what due diligence it conducted, prior to acquiring the disputed domain name. It does not expressly deny prior knowledge of the Complainant and does not deny having conducted an Internet search prior to acquiring the disputed domain name. The Response refers to the Respondent having conducted an Internet search for "Nexus Mutual", although it is not made clear when that search was conducted. The Respondent also neglected to attach the actual results of that search, probably because they overwhelmingly relate to the Complainant.

In a prior case involving the Respondent, namely *Temco Industrial v. Mira Holdings*, WIPO Case No. D2025-3913, the Respondent did in fact conduct Internet searches prior to acquiring the relevant domain name at auction for USD 12,540. In the present case, the Respondent paid roughly four times more than that, and it is therefore likely that the Respondent likewise conducted Internet searches prior to acquiring the disputed domain name. As discussed above, if the Respondent had conducted such a search, as is likely, then it would likely have been made plain to the Respondent that the disputed domain name's second-level portion is identical to the Complainant's mark, and that the mark was overwhelmingly associated with the Complainant.

If the Respondent did not conduct such a search, it should have. The Respondent is a professional domain name investor with a long history with the UDRP, having been involved, as respondent, in approximately 19 prior cases as far as the Panel can tell, with a number of those cases having been decided against it. The Respondent's history with the UDRP would have apprised it of the risks of not conducting searches and would have made it more alert to those risks. In fact, in *Stephen Tseronakis / ZoomerMedia Ltd. v. Mira Holdings,* CIIDRC Case No. 17716-UDRP, which was decided well before the acquisition date of the disputed domain name, the Respondent was specifically informed of the duty to search by the panel. If the Respondent chose to ignore this duty brought to its attention in the prior cases where it was found to have cybersquatted, in circumstances where conducting a basic Internet search would likely have revealed that the disputed domain name was overwhelmingly associated with the Complainant, then it did so wilfully, in full knowledge of the risks. It is this deliberateness, in the sense of being aware of the risks but intentionally disregarding them, that characterises its conduct as being in bad faith under the wilful blindness doctrine. WIPO Overview 3.1, section 3.2.3.

The Complainant's mark, which is identical to the disputed domain name's second-level portion, has the appearance of being a brand name or trademark, rather than a common-place dictionary phrase. This is a further reason why the Respondent would or should have been alert to the need to conduct due diligence searches.

The Respondent listed the disputed domain name for sale for USD 250,000. A high price does not, in and of itself, suggest targeting. However, the Panel finds the following statement of the panel in *All Star C.V., Converse, Inc. v. Narendra Ghimire,* WIPO Case No. DCO2024-0014 apposite in the particular circumstances of this case:

"While the Panel is well aware that dictionary word domain names can fetch a high price tag (at the same time, those tend to be in the '.com' TLD), this price likely filters out buyers who are interested in the non-trademark meaning of the term 'converse'. The Panel also infers that Respondent, an experienced domain name investor, was likely well aware that the price would filter out purchasers interested in only the dictionary, geographic, or surname connotations of the term. The Panel therefore infers that the price was knowingly set to limit the set of potential purchasers with a particular focus on the owner of both the CONVERSE Mark and the valuable <converse.com> domain name."

This is bolstered by the fact that the second-level portion of the disputed domain name appears to be overwhelmingly associated with the Complainant on the Internet currently, and also likely at the acquisition date, and there is a limited number of uses that could legitimately be made of the disputed domain name without the risk of encroaching upon the Complainant's trademark rights. See *Puma SE v. Kiril Vaitsekhovich*, WIPO Case No. DAE2021-0011.

The Respondent claims that "Nexus Mutual" is commonplace. It is not, as the Complainant's evidence shows.

The Respondent has only presented two examples of use by third parties of "Nexus Mutual / Nexus Mutuals", both of which do not assist its claim that the term is or was commonplace. Firstly, the screenshot for <nexus-mutuals.com> is dated in 2026, and that domain name was only registered in 2025. So, it would not have been available, and would not have suggested to the Respondent, that "Nexus Mutual" was commonplace at the acquisition date.

Secondly, the Respondent provided an Internet Archive screenshot dated 2018 for <nexusmutual.com.au> showing use of that domain name for an Australian credit union. At present, the domain name does not resolve to any website, and the Respondent itself states that this entity was the prior owner of the disputed domain name, which expired some time before the Respondent acquired it. This suggests that the Australian credit union may have been defunct by the time the Respondent acquired the disputed domain name. Additionally, even if it wasn't, a single example of another entity using a comparable name in another jurisdiction does not mean that it was commonplace when the Respondent acquired the disputed domain name.

The Respondent argues that it owns or has owned other "nexus" domain names, specifically <nexusworks.com>, <nexushotel.com>, and <housenexus.com>, and that its acquisition of the disputed domain name was in line with this pattern and without any intent to target the Complainant. Whilst owning other "nexus" domains may show that "nexus" has intrinsic appeal, it says nothing about "Nexus Mutual" specifically, which the Complainant's evidence shows was likely almost exclusively associated with the Complainant when the Respondent acquired the disputed domain name.

On balance of probabilities, the Panel finds that the Respondent was likely aware of the Complainant prior to acquiring the disputed domain name, and that it intended to sell the disputed domain name to the Complainant, alternatively that the Respondent failed in its duty to conduct due diligence searches prior to acquiring the disputed domain name.

The Panel finds that the Complainant has established the third element of the Policy.

**7. Decision**

For the foregoing reasons, in accordance with paragraphs 4(i) of the Policy and 15 of the Rules, the Panel orders that the disputed domain name <nexusmutual.com> be transferred to the Complainant.

*/Jeremy Speres/*
**Jeremy Speres**
Presiding Panelist

*/Christopher S. Gibson/*
**Christopher S. Gibson**
Panelist
Date: August 18, 2026

**8. Dissenting Opinion**

I respectfully dissent from the Majority's decision and vote to dismiss the complaint. This is an unusual and difficult case. The trademark NEXUSMUTUAL is a 2025 UK registration; the Respondent acquired <nexusmutual.com> on December 2, 2023. Where the trademark postdates the acquisition of the domain name a complainant may have a right but no actionable claim for cybersquatting, unless it also establishes that it has a common law right antedating the acquisition of the disputed domain name. Complainant argues for a common law right and attaches as evidence four news articles which I will review below. The Majority does not explore this issue of a common law right but simply announces on the basis of the postdated trademark registration that the Complainant satisfies its burden under Element 1. That is not good enough.

To have a common law right the Complainant must demonstrate that prior to the registration of the disputed domain name its mark had achieved secondary meaning. WIPO Overview, 3.1, section 1.3 ("To establish unregistered or common law trademark rights for purposes of the UDRP, the complainant must show that its mark has become a distinctive identifier which consumers associate with the complainant's goods and/or services.") It then sets forth the means for establishing "[r]elevant evidence demonstrating such acquired distinctiveness."

I do not believe that the Majority would disagree, that the services the Complainant offers are in a niche industry. Indeed, a niche within a niche. Annex 6, which appears to be an internal announcement of Complainant's launch to the niche community was issued on May 22, 2019. Annex 7 is a story published in 2020 by CoinDesk an online news and information company focused on cryptocurrencies, blockchain technology, and digital assets. Annex 8 is another online publication from 1kxnetwork. On August 4, 2021, it published a descriptive article describing the Complainant's services. Annex 9 is another CoinDesk publication, first published on February 16, 2021, and republished on May 9, 2023. These also appear on a Google search prior to Respondent's acquisition of the disputed domain name.

None of the four annexes announcing Nexus Mutual's emerging presence in the market would be described as journals that would be found on a local newsstand. Only to the niche community to which the Complainant's service is offered are these vehicles of communication equivalent to an everyday newspaper.

In none of these four releases is there any evidence of the kind required by WIPO Overview 1.3 to support a claim of an unregistered right. They are offered as substitutes for the kind of proof demanded by the jurisprudence summarized in WIPO Overview, 3.1, section 1.3. It is significant that of the original eleven annexes to the complaint there is not a single piece of evidence of its operation of its business.

The more difficult issue is Element 3. The question a complainant must answer to establish conjunctive bad faith is whether respondent knew or should have known on the date of acquisition that the disputed domain name corresponded to a trademark. The Majority simply inferred that because “the second-level portion of the disputed domain name appears to be overwhelmingly associated with the Complainant on the Internet currently, [that it is] also likely at the acquisition date.”

Why is it “also likely”? The logic alludes me because the evidence from both parties is that Respondent’s awareness of Complainant was more likely than not the result of the Complainant reaching out to Respondent in September 2025 (unaddressed by the Majority yet critical for establishing the date of awareness). Even taking into account the Google searches, it is questionable that Respondent could have interpreted these news reports as a nascent right when <nexusmutual.com> was offered by DropCatch on its public auction conducted on December 2, 2023.

It cannot be denied what is now currently evident about Complainant, but third party messaging is not sufficient to support a nascent mark that appears only in specialized “press coverages.” This messaging is not such as to alert a non-crypto professional investor to avoid bidding on a desirable domain name in December 2023.

In contrast to Element 1 that simply requires that the right be established any time before the filing of the complaint, a respondent’s bad faith is measured from the time of registration of the disputed domain name. WIPO Overview 3.1, section 3.,8.,1 (“Irrespective of the original creation date, if a respondent acquires a domain name after the complainant’s trademark rights accrue, ***the panel will look to the circumstances at the date the UDRP respondent itself acquired the domain name***.”)

Complainant’s argument for bad faith, as I read its submission, is based on a false premise that “‘Nexus Mutual’ is not a common phrase used generically in commerce. It is closely associated with the Complainant’s distinctive brand.” However, Complainant cannot claim invention of this coinage since it had already been used by an earlier registrant, and there is evidence in the record of other users of the same phrase. On this basis, I find it is not inconceivable that for Respondent the auctioning of <nexusmutual.com> was an opportunity to add to its inventory of “Nexus” themed domain names.

Having said this, I do not disagree with the Majority when in its own words it says “the second-level portion of the disputed domain name appears to be overwhelmingly associated with the Complainant on the Internet ***currently***.” My disagreement is that what is true “currently” cannot be projected backward in time to the date Respondent acquired the disputed domain name. In fact, I share the Majority’s concern that as seen from a *current* perspective, the phrase “Nexus Mutual” is solely associated with Complainant. But this raises a trademark issue outside the jurisdiction of the UDRP. This determination, therefore, is limited to the scope of the Policy and is made without prejudice to future litigation. The parties are free to pursue claims before a court of competent jurisdiction.

*/Gerald M. Levine/*
**Gerald M. Levine**
Panelist
Date: August 18, 2026